JODI LINKER
Federal Public Defender
Northern District of California
ELIZABETH FALK
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:      elizabeth_falk@fd.org

Counsel for Defendant Melero Luna

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 22–434 TNT |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | **Court:**        Courtroom 9, 19th  Floor |
| VICTOR MELERO LUNA, | **Hearing Date:**   March 15, 2024 |
| Defendant. | **Hearing Time:**   9:30 a.m. |

1

2

## INTRODUCTION

3

On April 10, 2003, Congress passed[1] the "Prosecutorial Remedies and Other Tools to end the

4

Exploitation of Children Today Act", Pub. L. No. 108–21, 181 117 Stat. 650 (2003) ("PROTECT

5

Act").  As applicable here, Section 103 of the PROTECT act raised the mandatory minimum sentence

6

to five years for any defendant convicted of distributing child pornography in federal court.  For the

7

reasons described by the government in its Sentencing Memorandum, the United States Attorney's

8

Office elected to exercise its prosecutorial discretion to charge this offense against Mr. Victor Melero

9

Luna, who at the time of this offense was barely18 years old and suffered from learning disabilities

10

and severe bullying in school.  Prior to the instant case, Mr. Melero Luna spent most of his time

11

indoors living in a virtual world, with hardly any friends or active interaction with the "real world" at

all.

12

This case has been a huge wake-up call for Mr. Melero Luna, who deeply regrets his behavior

13

and now sees that his shut-in, "living on a computer" life grossly impaired his brain, his judgment,

14

and his ethics.  Because of Congress' directives in the PROTECT Act and the prosecutorial

15

discretion exercised here, however, Mr. Melero Luna must now go to prison for five years.  That is

16

the end of the story here – there will be no second chances, no intermediary punishment, and no

17

opportunity for Mr. Melero-Luna to rehabilitate in other ways over the next five years.   Five years in

18

federal prison is a very long sentence for a first-time offender who is now only 23 years old.  But

19

there is nothing this Court, or undersigned counsel can do about it – other than urge the Court to

20

accept the

21

11(c)(1)(C) plea agreement and not impose additional time for the reasons stated here.

22

This is an extremely sad case for all parties involved -- particularly the victim M.M., whom Mr.

23

Melero-Luna deeply regrets harming.  Since his arrest, Mr. Melero-Luna has tried to do everything

24

he can to show how remorseful he is about his criminal behavior.  After initially being arrested and

25

then released from custody on November 10, 2022 he has been completely successful on pre-trial

26

release.

27

[1] The PROTECT Act passed the Senate by a vote of 98-0. 149 Cong. Rec. S5156, S5157 (Apr. 10, 2003 ). The PROTECT Act passed the House by a vote of 400-25. 149 Cong. Rec. H3075, H3076 (Apr. 10, 2003).

28

For the first time, he is obtaining one-on-one mental health treatment, in addition to group treatment for those with sex offenses who have committed similar harms.  He is committed to treatment, has a perfect pretrial release records, and has obtained full-time employment though the San Francisco Conservation Corps.  For the first time in his life, Mr. Melero-Luna feels that he *has* a life.  It is of no moment, as federal prison will be the next stop for Mr. Melero-Luna.  It will also likely be his final interaction with the criminal justice system.

Because he must, Mr. Melero-Luna respectfully requests the Court to honor the (c) plea agreement between the parties and sentence him to no more than five years in federal custody, followed by five years of supervised release, $3000 in restitution, and a $100 special assessment. He additionally requests that this Court carefully review and consider the proposed special conditions of supervised release to ensure that he is able to re-assimilate into modern society upon release from custody.   He is committed to rehabilitation – particularly with respect to his future use of the internet in a responsible and law-abiding manner  – he would just like to do so with clearly definted rules that are  realistic given the overarching presence of the internet in today's world.

**BACKGROUND**

**I.     In Response to Special Education Needs and Extreme Bullying, Mr. Melero Luna Lived a Life of Seclusion Over the Internet which Led to the Instant Offense**

Mr. Melero Luna grew up in a family desperate to secure him from the gang and drug-riddled neighborhood that existed out their front door.  As a kid who grew up squarely planted in Norteno gang territory, he recalls a mother and father who were terrified to allow him outside.  When he did go outside, traumatic things occasionally occurred.  *See* PSR at ¶ 45 (describing a gang assault on Mr. Melero Luna, as well as trauma from witnessing a mentally-ill neighbor stab himself).  Because his parents were desperate to keep him out of "gang life," Mr. Melero Luna was kept on a tight leash and not permitted much life outside the house.  Sadly, as described below, this well-intentioned protection led him to a damaging virtual life that surrounded video gaming and chatting, with little normal social interaction.

As a young child, Mr. Melero Luna had very few friends; he describes himself as a youth to the undersigned as "overweight, unattractive, awkward and learning disabled."  He further relays that he

1    was very "slow" in school and subjected to numerous "IEPs" (Independent Educational Plans)

2    through SFUSD.  After receiving large amounts of academic support, Mr. Melero Luna managed to

3    graduate Mission High School in 2018 – directly before the offense conduct in this case occurred.

4        Notably, Mr. Melero Luna's school experience was extremely unpleasant.   He was constantly

5    bullied in middle school by means of punching, head-slapping, teasing, body-shaming and being

6    poked with forks.  PSR ¶ 54.  These actions, coupled with his learning disabilities, led to poor self-

7    esteem on Mr. Melero Luna's part.  These self-esteem issues were extreme on the standard teenage

8    spectrum, leading Mr. Melero Luna to describe himself as "dumb and basically, worthless." *Id.*

9    Importantly, every physical space Mr. Melero Luna crossed outside his home (school and

10   neighborhood) was considered unsafe, scary, and non-negotiable.  In lieu of navigating the real, or

11   "physical" world, he then began to explore the virtual one in earnest.  As his life developed, Mr.

12   Melero Luna's one safe space (and the one area where he could safely find friends and

13   companionship) was online gaming. Absent positive reinforcement in the "real" world and too afraid

14   to develop "real" relationship with friends and peers, Mr. Melero Luna disappeared into the online

15   world and allowed his deeply rooted self-esteem issues to further devolve into criminal conduct.

16       Specifically, Mr. Melero Luna reflects that his online gaming platforms he engaged in

17   portrayed women in a terrible light – and likely contributed (along with his significant low-self-

18   esteem issues) to his serious brain mis-firing that led to the instant offense.  Video games that Mr.

19   Melero Luna heavily engaged in such as  "Red Dead Redemption" and "Grand Theft Auto" are well

20   documented as promoting violent and demeaning attitudes towards women .  *See, e.g.,*

21   https://theconversation.com/violence-towards-women-in-the-video-game-red-dead-redemption-2-

22   evokes-toxic-masculinity-106920 (last visited March 8, 2024);

23   https://journals.plos.org/plosone/article/file?id=10.1371/journal.pone.0152121&type=printable (last

24   visited March 8, 2024).  Absent regular, healthy interactions with people in general in social settings,

25   Mr. Melero Luna fully admits that he lost perspective on the impact that gaming had on his world

26   view.  Specifically, Mr. Melero Luna felt he was a loser in real life.  But in the online gaming world,

27   he exceled and found companionship through these games' narratives.  The narratives then took on

28   far more weight than they should have, and caused greater influence on Mr. Melero Luna than a

'normal" teenager.

Mr. Melero Luna also acknowledges that while on supervised release, he will need to address the significant impact that years of bullying has implanted on his psyche – specifically, how feeling powerless and meaningless for so long impacted his mindset and his effort to control others in the context of this case.  His resort to criminal conduct to break free of that feeling is a choice that Mr. Melero Luna has deeply internalized and sorely regrets.  To the undersigned, he has expressed on multiple occasions how upset he would be if someone had done something similar to his sister – a first step in what will undoubtedly be a long reckoning of his choices while serving five years in federal prison.

There is much to be hopeful about in this case, however.  First off, Mr. Melero Luna is extremely young.  He has had zero interaction with the criminal justice system before this case, and has a strong desire to learn about himself and grow such that nothing like this ever happens again. Given the facts on the table, it seems clear that addressing Mr. Melero Luna's self-esteem issues, as well as building in mechanisms on supervised release that force him to engage with the real world (as opposed to a virtual one) will go a long way to guaranteeing his future law-abiding life.

In this vein, it is also important for the Court to reflect upon the fact that the contact with the victim that led to the instant offense occurred between June, 2018 and March, 2019.  PSR ¶ 8-12. Mr. Melero Luna's date of birth is October 2, 2000; he was 17 years old when the offense contact began and barely 18 years old when the criminal distribution occurred.  Although the women he solicited for images were under 18 and definitely qualify as minor victims under the statute, the age disparity between perpetrator and victim is much smaller than the typical child pornography case this Court sees.  While Mr. Melero Luna's aggressiveness and persistence soliciting the images is deplorable, as was his conduct in threatening the victims in order to obtain more photographs and videos, the targeted females were closer to contemporaries of Mr. Melero Luna in terms of age.  In other words, the case at hand does not involve "sexually deviant proclivities" in the same manner as a case of a forty or fifty-year old man who possesses thousands of sexually explicit images of toddlers or elementary-school children.  It is Mr. Melero Luna's aggression in this case that must be addressed, more so than any fundamental mis-ordering of his natural interests.  This is a much easier

mindset to rewire than the former – and Mr. Melero Luna has already started this process.

## II. Following Arrest, Mr. Melero Luna has a Perfect Record on Pretrial Release and has Seriously Participated in Required Treatment Sessions.

The background and history of the offense conduct is adequately and accurately described in the PSR.  On January 15, 2020, officers executed a search warrant at Mr. Melero Luna's residence PSR ¶ 13.  During that search and seizure, Mr. Melero-Luna was interviewed extensively by federal agents.  As nervous and timid young man with no prior interaction with law enforcement, he readily agreed to speak with officers and largely admitted the accused conduct.  *Id.*  Following this interview, Mr. Melero-Luna waited in dread for nearly two years until the federal government filed an Indictment against him charging him with a violation of 18 U.S.C. §§ 2252(a)(2) and (b) – Distribution of Child Pornography. PSR ¶ 1.  He was arrested on November 15, 2022, and released the next day on a person recognizance bond with pretrial conditions required under the Adam Walsh Act, including electronic monitoring. PSR at 4-5.  Mr. Melero-Luna then chose to not file any motions and plead guilty to the charge in the Indictment on December 1, 2023. PSR ¶ 2. He fully accepts responsibility for his actions and greatly regrets his decisions. PSR ¶ 20-21.

Since release from custody for over a year, Mr. Melero Luna has strictly complied with conditions of pre-trial release with no violations. PSR ¶ 5. He has also sought and maintained full time employment with the San Franciso Conservation Corps, an interactive position that has shown Mr. Melero Luna the benefits and joys of working in the real world, with real people.  He has made a substantial contribution to this organization and has greatly enjoyed waking up and having a purpose to work each day.  All signs point to one truth; Mr. Melero Luna well understands how serious this case is and is committed to never harming any person in this manner again.

## ARGUMENT

## I. The Required Sentence of Five Years in Custody is Sufficient but not Greater than Necessary to Achieve the Sentencing Goals of § 3553(a).

In sentencing Mr. Melero Luna, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 552 U.S. 85 (2007). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than

1  necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir.

2  2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the

3  offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford

4  adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant;

5  and (6) provide the defendant with needed educational or vocational training, medical care, or other

6  correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also

7  directs the Court to consider additional factors, including: the nature and circumstances of the

8  offense, § 3553(a)(1); the history and characteristics of the defendant, 3553(a)(1); the kinds of

9  sentences available, § 3553(a)(3); the sentencing guideline range, § 3553(a)(4); pertinent Sentencing

10  Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, §

11  3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

12       Under *Booker*, the sentencing court must impose the lowest reasonable sentence that fulfills the

13  goals of Congress, unencumbered by offense levels, criminal history, or the availability of authorized

14  downward departures. While the Court may apply a presumption of reasonableness to sentences

15  within the applicable Guidelines range, the district court "does not enjoy the benefit of a legal

16  presumption that the Guidelines sentence should apply." *Rita v. United States*, 551 U.S. 338, 351

17  (2007). Nor is it required to use a formulaic approach yielding a mathematical justification of non-

18  Guidelines sentences. *See Gall v. United States*, 558 U.S. 38, 49 (2007). Rather, it must exercise

19  "reasoned sentencing judgment, resting upon an effort to filter the Guidelines' general advice through

20  § 3553(a)'s list of factors." *Rita*, 551 U.S. at 358.

21       The Guidelines calculation in the PSR, with a final offense level of 28 and a Criminal History

22  Category of I, results in an advisory Guidelines range of 78–97 months. PSR at Recommendation.

23  Much like other child pornography cases, Mr. Melero Luna's Guidelines range—while technically

24  correct—is excessive and overly punitive. The required sentence of 60 months in custody along with

25  five years of supervised release is sufficient to achieve all the goals of sentencing.

26      **A.**    **The Child Pornography Sentencing Guidelines are Excessive, not Based on**
   **Empirical Evidence and Over-Represent the Seriousness of Mr. Melero Luna's**
27      **Conduct.**

28      Though correctly calculated, the Guidelines range is excessive, not based on empirical

evidence, and over-represents the seriousness of Mr. Melero Luna's conduct. Ordinarily, the Guidelines are entitled to deference because they are the product of years of data-driven and considered analysis. When a particular Guideline is not the result of careful study or empirical analysis, by contrast, such deference is unfounded. *See Kimbrough*, 552 U.S. 85 at 108–09. In *Kimbrough*, a case involving the sentencing disparity between crack cocaine and powder cocaine offenses, the Supreme Court held that district courts have discretion to vary from a correctly calculated Guidelines range "based solely on policy considerations, including disagreements with the Guidelines." *Id.* at 101. In particular, the Court recognized that when guidelines are not the result of "empirical data and national experience, guided by a professional staff with appropriate expertise," they do not "exemplify the Commission's exercise of its characteristic institutional role." *Id.* at 109. In such cases, sentencing courts may conclude that the Guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes even in a mine-run case." *Id.* at 110.

The Ninth Circuit has reached the same conclusion specifically regarding the child pornography Guidelines at U.S.S.G. § 2G2.2. *See United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011). Not only does the *Henderson* decision recognize that "district courts may vary from the child pornography guidelines, § 2G2.2, based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case," *id.* at 963, but it holds that a district court "commits procedural error when it fails to appreciate its *Kimbrough* discretion to vary from the child pornography Guidelines based on a categorical disagreement with them." *Id.* at 964.[2]

The Guidelines for child pornography offenses have increased dramatically over the years, and in nearly every instance, these increases were mandated by Congress, often over the objection of the Sentencing Commission. *See Henderson*, 649 F.3d at 960–62. When possession of child pornography was criminalized in 1990, the Sentencing Commission created a new Guideline for that offense, with

---

[2] Other Circuits have reached similar conclusions. *See, e.g.*, *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (holding that § 2G2.2 "can lead to unreasonable sentences that are inconsistent with what § 3553 requires"); *United States v. Grober*, 624 F.3d 592, 608–09 (3d Cir. 2010) (holding that because § 2G2.2 was not developed pursuant to the Commission's characteristic institutional role, district courts may vary from on policy grounds); *United States v. Stone*, 575 F.3d 83, 90 (1st Cir. 2009) (same).

1  a base offense level of 10 and a two-level enhancement for material involving a prepubescent minor.

2  *Id.* (citations omitted). Congress was not satisfied, however, and in 1991, "over the objection of the

3  Commission," Congress directed the Commission to increase penalties for child pornography

4  offenses. *Id.* at 960. Among other changes, Congress "explicitly ordered the Commission" to increase

5  the base offense levels to 15 (for receipt, transportation, and trafficking) and 13 (for possession). *Id.*

6  at 960–61. Congress demanded further increases in 1995, increasing the base offense level by two

7  levels and adding a two-level enhancement for use of a computer. [3] *Id.* When the Commission

8  submitted a report to Congress that was critical of the congressionally mandated two-level computer

9  enhancement because "it failed to distinguish serious commercial distributors from more run-of-the-

10  mill users," Congress "responded with legislation that directed the Commission to add enhancements

11  for the use of a computer to persuade, induce, entice, coerce or facilitate the transport of a child; to

12  increase penalties in any case in which the defendant engaged in a pattern of activity; and to clarify

13  that distribution included distribution for nonpecuniary gain." *Id.* at 961 (citations omitted).

14       In sum, the child pornography Guidelines have been substantively revised nine times over their

15  thirty years of existence. Most of the revisions were Congressionally-mandated and not the result of

16  an empirical study. As the Commission itself has explained, "The frequent mandatory minimum

17  legislation and specific directives to the Commission to amend the [G]uidelines make it difficult to

18  gauge the effectiveness of any particular policy change, or to disentangle the influences of the

19  Commission from those of Congress." *Id.* (citation omitted). The result is that many of the

20  individuals sentenced under § 2G2.2 face Guidelines ranges that are excessive and unwarranted.

21       Section 2G2.2's overly harsh sentencing ranges also run afoul of the requirement that the

---

23  [3] The two-level enhancement for use of a computer is meaningless, given that print pornography has
24  become obsolete in an increasingly digital world. *See, e.g., United States v. Carrie Myles*, 16-CR-409
    HSG (N.D. Cal. 2017) (granting variance because "use of a computer" enhancement applies in every
    case and is not a useful indicator of criminal activity); *United States v. Christopher Lee Carignan*,
25  15-CR-003 VC (N.D. Cal. 2016) (varying from advisory range because of "problems" with the "use
    of a computer" enhancement and the enhancement for the number of images possessed); *see also*
26  *United States v. R.V.*, 157 F. Supp. 3d 207, 232–36 (E.D.N.Y. 2016) (explaining how the "Internet
    revolution enabled child pornography consumption."). This exemplifies yet another problem with the
27  child pornography Guidelines—the fact that the Guidelines are outdated. *See* U.S. Sentencing
    Comm'n, 2012 Report to the Congress: Federal Child Pornography Offenses (2012) at iii,
28  https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-andreports/sex-offense-
    topics/201212-federal-child-pornographyoffenses/Full_Report_to_Congress.pdf.

sentencing court impose a sentence based on the individual characteristics of the offender. *See* 18 U.S.C. § 3553(a); *see also Henderson*, 649 F.3d at 965 (Berzon, J., concurring). As Judge Berzon notes, "an unduly deferential application of § 2G2.2 will lead to the vast majority of offenders being sentenced to near the statutory maximum term," a result which "stands in significant tension with a sentencing judge's duties 'to consider every convicted person as an individual.'" *Id.* (citation omitted).

Because the "use of a computer" enhancement in particular applies in virtually every case, what becomes clear is that it is not a "specific offense characteristic" at all but rather innate to the offense. This enhancement alone leads to a 2-level increase in Mr. Melero Luna's offense level calculation, which started at an already-inflated base offense level of 22. Assuming that the base offense level of 22 is empirically justified, simply removing that one "use of a computer" enhancement would place Mr. Melero-Luna at Offense Level 26, CHC I, or 63-78 months (which is very close to the mandatory minimum sentence called for by the 11(c)(1)(C) plea here). *This reason alone* justifies the Court's variance to a 60 month sentence.

In summary, the Guidelines usually are considered a cornerstone of reasonableness, but only because it is assumed that each section was "the product of years of careful study." *United States v. Claiborne*, 439 F.3d 479, 481 (8th Cir. 2006). Where, as here, it has been established that the Guidelines were not a product of careful study or empirical analysis, any presumption that the child pornography Guidelines are reasonable is especially unfounded. Accordingly, the Guidelines range here should be afforded significantly less weight by this Court than in the ordinary case, and the Court should vary downwards to 60 months in custody to account for its lack of empirical and practical support.

A variance to the mandatory minimum here for Mr. Melero-Luna, a first-time offender who is only 23 years old, is accordingly appropriate.

**B.      The United States Attorney's Office and the Probation Office Concur On the 60 Month Sentence.**

It is also worth noting is that both the prosecution and the Probation Office agree that the appropriate sentence in this case is the statutory minimum sentence.  All parties accordingly come to

the Court with a universal recommendation; there is no reason for the Court to deviate from the parties' joint requested sentence.

## II.     An Eighteen-Month Variance Down to Sixty Months in Custody is Appropriate Based on the History and Characteristics of Mr. Melero Luna

The offense in this case is very serious and Mr. Melero Luna appreciates that the Court must consider the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). Mr. Melero Luna has read through the victim impact statement in the PSR and fully realizes how his actions deeply hurt the victim with long-lasting effects. *See* PSR at ¶ 20-21.  This was a horrible victimization that Mr. Melero Luna is ashamed of promulgating.  Given the seriousness of the offense, a sixty-month prison term is more than adequate when considering the concurrent life-altering punishments that Mr. Melero Luna has or will experience, including:

- He has faced public humiliation for his offense when it was shared on the news and media
- He will have *lifetime registration as a sex offender* for all of the public to see
- His employment, housing, and other opportunities will be restricted by his registration status
- He will need to pay back restitution in this case despite his limited financial means
- He will have to comply with strict supervision conditions that bear the threat of incarceration and severely impede on his personal life

A longer term in custody beyond sixty months will not further fulfill the goals of sentencing. Through treatment, Mr. Melero Luna now better understands how his self-damaging lifestyle and seclusion from the real world caused a temporary brain mis-firing that led him to victimize the women impacted here.  He has also comported himself throughout this entire case in a manner that demonstrates he understands the seriousness of his misconduct.  In this vein, Mr. Melero Luna has performed flawlessly on pre-trial release for over a year and is working hard at the San Francisco Conservation Corp – his first job that has allowed him positive interactions with supportive people who recognize his talents and have been encouraging of his success.  Although no one aspires to be sent to federal prison, Mr. Melero Luna does view this case as a necessary wake-up call that his life was headed in the wrong direction.  Through therapy, he finally been forced to reckon with his past and can best continue developing the tools to ensure he does not return to the dangerous and self-destructive behaviors of his past.

These successes – as well as the issues described earlier in this memorandum – more than justify

1   this Court's departure to the mandatory minimum sentence.

2   **III.   The Court Should not Impose Special Assessments Under 18 U.S.C. §§ 3014 and 2259A**

3       Under the Justice for Victims of Trafficking Act of 2015 ("JVTA"), 18 U.S.C. § 3014(a), a

4   "non-indigent person" convicted of possession of child pornography is subject to a $5,000 special

5   assessment.  The qualifier of "non-indigent person" distinguishes this special assessment from the

6   general special assessment statute, 18 U.S.C. § 3013(a)(2)(A), which mandates a $100 special

7   assessment on all defendants convicted of a felony regardless of whether they are indigent or not.

8   "Indigent" is a legal term of art, meaning "someone who is too poor to hire a lawyer and who, upon

9   indictment, becomes eligible to receive aid from a court-appointed attorney and a waiver of court

10  costs."  *See* "Indigent Defendant," *Black's Law Dictionary* (10th Ed. 2014).

11      Similarly, 18 U.S.C. § 2259A instructs the Court to assess not more than $17,000 on a person

12  convicted of § 2252(a)(2). It further directs a Court to consider the § 3553(a) sentencing factors and

13  the factors related to imposition of a fine laid out in 18 U.S.C. § 3572 in order to determine the

14  amount of the assessment. 18 U.S.C. § 2259A(c). The analysis for this particular special assessment,

15  then, should track the Court's analysis of whether a fine should be imposed.

16      Mr. Melero Luna qualified for appointed counsel in this matter precisely because he is indigent.

17  The PSR confirms that he does not have the ability to pay a fine. PSR ¶ 56-57 and Recommendation.

18  The $5,000 special assessment in § 3014(a) thus does not apply to Mr. Melero Luna because he is not

19  a "non-indigent person" as required by the statute. Since he does not have the ability to pay a fine, he

20  similarly does not have the ability to pay an additional assessment under § 2259A.

21  **IV.   Mr. Melero Luna Requests the Court order the Victim Impact Statement Stricken from
22       the PSR Prior to its Delivery to the Bureau of Prisons**

23      To better protect Mr. Melero Luna, who will already be a vulnerable inmate at the BOP given

    his age, lack of experience with the criminal justice system and offense of conviction, the defense
24
    respectfully requests the Court order the victim impact statements stricken from the PSR before it is
25
    submitted to the BOP. The Crime Victims' Rights Act ("CVRA") gives victims the right to be
26
    "reasonably heard at any public proceeding in the district court involving . . . sentencing[.]" 18
27
    U.S.C. § 3771(a)(4). The CVRA does not, however, provide victims the right to have their statements
28

1   included in a defendant's PSR, and accordingly, such statements should not be included. *See United*

2   *States v. Burkholder*, 590 F.3d 1071 (9th Cir. 2010).

3       To be clear, Mr. Melero Luna fully recognizes that the victim in this case endured a terrible

4   trauma by the dissemination, use and continued viewing of her images, and in no way seeks to

5   diminish that reality or take away from the victim's right to be heard in this matter.  He fully agrees

6   that the Court may consider these statements under Rule 32. Pursuant to *Burkholder*, however, this

7   Court has discretion to order such statements be stricken or redacted before the PSR is submitted to

8   the BOP; doing so violates neither the CVRA, nor Rule 32.  *Id*. at 1075-77. Mr. Melero Luna

9   respectfully requests the Court exercise that discretion here.

10  **V.    Objections to Proposed Special Conditions of Supervised Release.**

11      Probation recommends that the Court impose several special supervised release conditions.

12  PSR Recommendation at 3–8. Mr. Melero Luna respectfully objects to proposed supervised release

13  conditions 2, 5, 7, 11 and 12, because they are either overbroad, untethered to the offense of

14  conviction, would violate his First Amendment rights, and/or infringe upon his liberty to a greater

15  extent than is necessary to fulfill the objectives of supervised release.  He also objects to the

16  imposition of Special Condition # 6 in its requirement that he adhere to all terms of the Acceptable

17  Use Contract.

18      Courts may impose supervised release conditions "if they are reasonably related to the goal of

19  deterrence, protection of the public, or rehabilitation of the offender." *United States v. T.M.*, 330 F.3d

20  1235, 1239–40 (9th Cir. 2003) (citing 18 U.S.C. §§ 3583(d)(1) and 3553(a)). Conditions must also

21  "involve no greater deprivation of liberty than is reasonably necessary to achieve those goals" and be

22  consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to

23  § 994(a). *United States v. Napulou*, 593 F.3d 1041, 1044 (9th Cir. 2010); 18 U.S.C. § 3583(d)(2), (3).

24  Conditions "should relate to the nature and circumstances of the defendant's offense and to the

25  defendant's history and personal characteristics." *United States v. Hohag*, 893 F.3d 1190, 1192 (9th

26  Cir. 2018).  Here, Mr. Melero Luna argues that special conditions #2, 5, 7, 11 and 12 do not meet the

27  requisite legal standard for imposition.

28

**A.** **Special Condition 2 is Untethered to the Offense, and is Accordingly Overbroad and Unnecessary.**

Recommended special condition of supervised release #2 is that Mr. Melero Luna shall not open new lines of credit and/or incur new debt without the prior permission of the Probation Officer.  This condition is normally added in cases of financial fraud and/or identity theft where the defendant at issue has committed criminal activity by means of applying for credit cards in other people's names, or committed some sort of credit-related fraud.  Neither issue is applicable to the instant case.  The proposed condition cannot be justified as "reasonably related to the goal of deterrence, protection of the public, or rehabilitation of [a child pornography] offender." The Court accordingly should not impose special condition # 2.

**B.** **Special Conditions 5, 6, and 7 as Worded in the PSR are Unconstitutional, Overly Restrictive, and Should Either be Eliminated by this Court or Reworded and/or Reworked by this Court and not Imposed in their Current Form.**

Mr. Melero Luna objects to proposed supervised release condition 5[4], 6[5] 7[6] in their current written form as substantively unreasonable because while related to the goals of deterrence and protection of the public, they are overbroad and "infringe[] more on [Mr. Melero Luna's] liberty than is reasonably necessary to accomplish these statutory goals." *United States v. Evans*, 883 F.3d 1154, 1161 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 133 (2018) (citing *United States v. Wolf Child*, 699 F.3d 1082, 1090 (9th Cir. 2012) and 18 U.S.C. § 3583(d)(1), (2)) (internal quotations omitted). Taken together, the conditions unequivocally bar Mr. Melero Luna from possessing or using any

---

[4] Special Condition # 5 reads: "You must not possess or use a computer or computer-related device without the prior approval of the probation officer. 'Computer or computer-related device' means any electronic device capable of creating, accessing, storing, viewing, or transmitting material with visual depictions of sexually explicit conduct.  'Computer or computer-related device' includes (but is not limited to) desktop and tower computers laptop computers, smartphones, security cameras (such as 'nanny cams' or cameras linked to doorbells) USB or thumb drives, gaming platforms, compact discs and external hard drives."

[5] Special Condition # 6 reads: "As directed by the probation officer, you must enroll in the probation office's Computer and Internet Monitoring Program (CIMP) and abide by the requirements of the CIMP program and Acceptable Use Contract."

[6] Special Condition # 7 reads: "You must not access the Internet or any 'on-line computer service' at any location (including employment) without the prior approval of the probation officer. 'On-line services' include any Internet service provider, or any other public or private computer network. As directed by the probation officer, you must warn your employer of restrictions to your computer use."

1  electronic device—including a computer or mobile phone—or accessing the internet for any purpose

2  whatsoever without the prior approval of his probation officer. He cannot, for example, use a

3  smartphone or work computer for non-internet related tasks, like placing a phone call or inputting his

4  work schedule on a calendar. Similarly, he cannot access the internet in ways we have all come to

5  rely on, such as looking up the bus schedule, applying for a job, using Google Maps, listening to

6  music, or reading the news. *See United States v. LaCoste*, 821 F.3d 1187, 1191 (9th Cir. 2016)

7  (recognizing the use of the internet "is vital for a wide range of routine activities in today's world").

8  "Cutting off all access to the Internet constrains a defendant's freedom in ways that make it difficult

9  to participate fully in society and the economy." *Id*.

10         Because of the prevalence of the internet in today's society, "courts have upheld conditions

11  prohibiting all use of the Internet only in limited circumstances." *Id*.; *see also Packingham v. North*

12  *Carolina*, 137 S. Ct. 1730, 1735–36 (2017) (explaining that the internet has become a quintessential

13  forum for the exercise of First Amendment rights and striking down a statute prohibiting sex

14  offenders from using social media). Even in cases involving child pornography or sex-offender

15  offenses, courts have struck bans on the internet or computers. *United States v. Ellis*, 984 F.3d 1092,

16  1104 (4th Cir. 2021) (involving defendant convicted of failure to register as a sex offender and

17  holding condition banning internet access was impermissibly overbroad); *United States v. Holena*,

18  906 F.3d 288, 292 (3d Cir. 2018) (holding computer, communication-devices, and internet ban

19  overbroad even though use of the internet was integral to the defendant's offense of using the internet

20  to try to entice a child into having sex); *United States v. Crume*, 422 F.3d 728, 733 (8th Cir. 2005)

21  (holding bar on computer and internet access greater deprivation of defendant's First Amendment

22  rights than was reasonably necessary for defendant convicted of child pornography offense); *United*

23  *States v. Holm*, 326 F.3d 872, 877–78 (7th Cir. 2003) (condition barring defendant internet access

24  impermissible even where convicted of child pornography offense); *United States v. Freeman*, 316

25  F.3d 386, 391–92 (3d Cir. 2003) (condition forbidding defendant convicted of child pornography

26  offense computer in home or using internet service without approval of probation officer overly

27  broad); *United States v. Sofsky*, 287 F.3d 122, 126–27 (2d Cir. 2002) (same); *United States v. Wells*,

28  29 F. 4th 580,589-590 (9th Cir. 2022)(finding special condition of supervision an unlawful sentence

1  because defendant's restricted use from any "computer" as defined under 18 U.S.C. 1030(e)(1) as

2  unconstitutionally vague).

3       Specifically, Mr. Melero Luna objects to Special Conditions  # 5, 6 and 7 as follows:

### 1.      Special Condition # 5

5       Special condition #5 is so overbroad that it appears to prevent Mr. Melero Luna from using a

6  Ring doorbell camera to check to see if the person at the door to his apartment is a UPS driver as

7  opposed to an unknown person.  He similarly cannot play a compact disc in his car or house under

8  this condition.  Nor can he use any public computer that is capable of accessing the Internet for any

9  reason, including a book check-out computer at a public library or assisting his parents with

10  navigating directions in a car using Google maps using their phone(s). It also seemingly prevents him

11  from singularly using a device unapproved and unmonitored by Probation for the innocuous, one-off

12  purposes described above.  Overall, this condition should only require preapproval for "possessing" or

13  "owning" a computer, not "using" one for any and all purposes that Mr. Melero Luna might confront

14  in daily life.  The need to "use" random computers of all types in modern society is constant, and

15  probation officers will never be immediately available to offer permission to use every type of

16  internet-accessible computer necessary to navigate the world.  The condition that Probation is

17  attempting to impose is simply not practical nor workable given the demands of modern life.

18       The Court should accordingly decline to impose this blanket condition as to any and all

19  possible "computers" that Mr. Melero Luna may encounter as he navigates the modern world post-

20  release, and should instead reword this condition to computers and phones that Mr. Melero Luna

21  "owns" or "possesses."

### 2.      Special Condition # 6

23       Special Condition # 6 requires adherence to the "CIMP" (Computer and Internet Monitoring

24  Program) and asks the Court to require Mr. Melero Luna to adhere to the terms of the Acceptable Use

25  Contract. The undersigned has reviewed this Court's standing orders and is not aware if the Court has

26  already reviewed the CIMP and the Acceptable Use Contract in an earlier case.  If not, the

27  undersigned urges this Court to do so prior to granting blanket authority to the Probation Department

28  to monitor and limit Mr. Melero Luna's internet use in the manners suggested in those protocols. *See*

Exhibit A (CIMP); *see also* Exhibit B ("Acceptable Use Contract.[7]")

For example, in *United States v. Carter*, CR-20-253 VC, Judge Chhabria declined to adopt Standard Condition 6 related to the CIMP and Acceptable Use Contract, and instead clarified that the probation officer's authority to restrict should be subjected to important limitations.  *See id.* at Dkt 52.   Here, Mr. Melero Luna respectfully submits that this Court should go much further to guarantee Mr. Melero Luna's constitutional rights, as well as his continued success on supervised release by declining to adopt the blanket authority suggested by the Probation Department by means of the Acceptable Use Contract.

The CIMP program involves two separate documents: the Participant Agreement (Exh. A) and the Acceptable Use Contract (Exh. B).  Other than Paragraph 1, Mr. Melero Luna has no objection to the Participant Agreement. It contains eight requirements, most of which relate to Probation's ability to install various forms of monitoring software and hardware. *See* Ex. A, Participant Agreement ¶¶ 4-8.1 Mr. Melero Luna recognizes that these are reasonable requirements with respect to a computer or smartphone that he owns and uses on a regular basis.

The only section of the Participant Agreement that concerns Mr. Melero Luna is ¶ 1, which provides: "If applicable, I will adhere to the Computer & Internet Acceptable Use contract." *See id.* at ¶ 1.  Unlike the Participant Agreement, the Acceptable Use Contract contains restrictions that are overbroad, vague, or otherwise contrary to § 3583(d)'s requirement that conditions of supervised release be "reasonably related to the goal of deterrence, protection of the public, or rehabilitation of the offender," and involve "no greater deprivation of liberty than is reasonably necessary." Mr. Melero Luna respectfully requests that the Court specify that he is not subject to the Contract.

The first problem with the Acceptable Use Contract is that it gives the individual probation officer unlimited discretion to dream up and impose additional restrictions. In addition to the Contract's 29 enumerated standard restrictions, it has 6 "special restrictions," one of which is simply

---

[7] The attached documents in Exhibits A and B are the most current versions currently available to the undersigned of the CIMP and the Acceptable Use Contract.  Prior to the sentencing hearing, the undersigned will endeavor to obtain copies of the 2024 versions of these documents, to see if any meaningful changes have been made.

called "Other," with a blank space for the probation officer to write in additional restrictions. *See* Acceptable Use Contract, Exhibit B at 5. The Court has no opportunity to review whatever "Other" restrictions might be added to the Contract. Nor does the supervisee have the option of declining to abide by them, no matter how unreasonable or even unconstitutional. According to the first paragraph of the Contract, the supervisee is "required to follow the rules as stated ... in this Acceptable Use Contract," and failure to do so "may result in temporary or permanent loss of permission to use a computer, modification of the conditions of your supervision, revocation or your supervision or other sanctions as determined by your probation officer or the court." *See id*. at ¶ 1. Allowing the probation officer unchecked discretion to create conditions and determine sanctions is not only illogical; it is unconstitutional. *See United States v. Stephens*, 424 F.3d 876, 881 (9th Cir. 2005) (explaining that the longstanding rule that "a probation officer may not decide the nature or extent of the punishment imposed upon a probationer" is a limitation "of constitutional dimension").

The second problem with the Acceptable Use Contract is that it includes unconstitutional restrictions. For example, ¶ 22 provides that "[o]nline pornography is prohibited unless specifically approved by your probation officer." *See* Acceptable Use Contract at ¶ 22. The Ninth Circuit has explicitly rejected conditions requiring that a supervisee "not possess 'any pornography,' including legal adult pornography."[8] *United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002). As the Court explained in that case, such conditions violate Due Process because "a probationer cannot reasonably understand what is encompassed by a blanket prohibition on 'pornography.'" *Id*. (citations omitted). Nor can the unconstitutional vagueness of such a condition be cured by allowing the probation officer to interpret it. *See id*. (noting that "[a] probation officer could well interpret the term more strictly than intended by the court or understood by [the defendant]"); *see also United States v. Loy*, 237 F.3d 251, 266 (noting the "real danger that the prohibition on pornography may ultimately translate to a prohibition on whatever the officer personally finds titillating").

---

[8] For the same reasons, Mr. Melero Luna objects to the Court's imposition **of Special Condition # 11** (complete ban on the viewing of all pornography "or other materials depicting sexually explicit conduct) as unconstitutional.  This condition, as worded, virtually eliminates Mr. Melero Luna's ability to watch any "R" rated film that involves sexually explicit conduct on the part of the actors, which is virtually every "R" rated movie.

1    Other requirements contained in the Contract implicate the First Amendment and are contrary

2    to the Supreme Court's holding in *Packingham*. One of the optional "special restrictions," for

3    example, directs that the supervisee "shall not access newsgroups and shall not upload and/or

4    download any material from newsgroups." *See* Contract at 5. As the Supreme Court recognized in

5    *Packingham*, the First Amendment is violated by restrictions that "bar access to what for many are

6    the principal sources for knowing current events, checking ads for employment, speaking and

7    listening in the modern public square, and otherwise exploring the vast realms of human thought and

8    knowledge." *Packingham*, 137 U.S. at 1737. While the ban on news is the most egregious restriction,

9    it is not the only one that implicates Mr. Melero Luna's First Amendment rights. For example, ¶ 11

10   prohibits supervisees from "access[ing] or maintain[ing] a 'profile' on Facebook, MySpace, Twitter,

11   or other social networking sites without specific prior approval"; and the optional "Special

12   Restrictions" include a restrictions that provides prohibitions on "access[ing] newsgroups." See

13   Exhibit B, Contract at ¶ 11. This restriction is strikingly similar to the law that the Supreme Court

14   struck down in *Packingham*.

15         All told, the Acceptable Use Contract is unduly restrictive and the Court should decline to

16   require Mr. Melero Luna to adhere to it.  To the extent the Court approves of certain provisions of the

17   Acceptable Use Contract, it should strike the limitations described above and decline to authorize the

18   Probation Department to create and enforce undelineated restrictions without this Court's approval.

19                          **3.      Special Condition # 7**

20         Special Condition 7 provides: "You must not access the Internet or any 'on-line computer

21   service' at any location (including employment) without the prior approval of the probation officer.

22   'One-line services' include any Internet service provider, or any other public or private computer

23   network.  As directed by the probation officer, you must warn your employer of restrictions to your

24   computer use."  PSR Sentencing Recommendation at 4-5.

25         It is a 'fundamental principle of the First Amendment" that "all persons have free access to

26   places where they can speak and listen, and then, after reflection, speak and listen once more."

27   *Packingham*, 137 S. Ct. at 1735.  In *Packingham*, the Supreme Court held that a North Carolina

28   statute violated the First Amendment by prohibiting registered sex offenders from accessing social

1  media sites that allow minors.  *Id.* at 1733.  The Court characterized the statute as "a prohibition

2  unprecedented in the scope of First Amendment speech it burdens," explaining:  "North Carolina

3  with one broad stroke bars access to what for many or the principal sources for knowing current

4  events, checking ads for employment, speaking and listening in the modern public square, and

5  otherwise exploring the vast realms of human thought and knowledge."  *Id.* at 1737.  By foreclosing

6  such access, the statute "prevent[ed] the user from engaging in the legitimate exercise of First

7  Amendment rights."  *Id.*

8       The same analysis applies here.  "Section 3583's tailoring requirement reflects constitutional

9  concerns," and "a condition is not narrowly tailored if it restricts First Amendment freedoms without

10  any resulting benefit to public safety."  *Holena*, 906 F.3d at 294.  "Under *Packingham*, blanket

11  internet restrictions will rarely be tailored enough to pass constitutional muster."  *Id.* at 295.  Denying

12  Mr. Melero Luna the ability to look for work on LinkedIn, or petition his elected representatives on

13  Twitter, *see Packingham*, 137 S .Ct. at 1735, does nothing to protect the public or promote any other

14  goal of supervised release.  And the restrictions on Mr. Melero Luna's exercise of his First

15  Amendment rights are far greater than the restrictions imposed by the North Carolina statute

16  invalidated in *Packingham*.  There, the ban was limited to social media sites that allow minors; here,

17  the ban applies to *every* site, no matter how benign or unrelated to his offense.

18       Moreover, the internet ban unnecessarily impedes Mr. Melero Luna's ability to participate in

19  society and the economy.  As the Ninth Circuit has recognized, "[u]se of the Internet is vital for a

20  wide range of routine activities in today's world – finding and applying for work, obtaining

21  government services, engaging in commerce, communicating with friends and family, and gathering

22  information on just about anything, to take but a few examples."  *LaCoste*, 821 F.3d at 1191.  Cutting

23  off all access to the Internet constrains a defendant's freedom in ways that make it difficult to

24  participate fully in society and the economy."  *Id.*

25       For this reason, the Second, Third, Seventh, Eighth, and Tenth Circuits all have held that, even

26  for defendants convicted of possession of child pornography, complete internet bans (including

27  conditions that allow internet use only with prior approval from the probation officer) are overbroad

28  and violate § 3583(d).  *See, e.g., Sofsky*, 287 F.3d at 124; *Freeman*, 316 F.3d at 391-92; *Holm*, 326

1    F.3d at 877; *Crume*, 422 at 733; *Blair*, 933 F.3d at 1279-80.  Supervised release conditions must

2    permit a defendant "to function in the modern world." *Holm*, 326 F.3d at 878.  And the internet is "a

3    means of communication [that] has become a necessary component of modern life." *United States v.*

4    *Ullman*, 788 F.3d 1260, 1261 (10th Cir. 2015).  Banning access to the internet prevents a defendant

5    from "doing everyday tasks that have migrated to the internet," and from using "websites conveying

6    essential information like news, maps, traffic or weather." *Holena*, 906 F.3d 294.  It is "the early

7    21st century equivalent of forbidding all telephone calls or all newspapers." *Holm*, 326 F.3d at 879.

8    There is no reason to believe that any goal of supervised release will be served by preventing Mr.

9    Melero Luna from engaging in such commonplace activities as shopping on Amazon; hailing a ride-

10   sharing service; tracking his daily steps; or obtaining access to state and federal government websites.

11   If anything, by making it more "difficult to participate fully in society and the economy," *LaCoste*,

12   821 F.3d at 1191, these prohibitions undermine what the Sentencing Commission has identified as

13   the "primary purpose of supervised release," namely, facilitating "the integration of offenders back

14   into the community."  U.S. Sentencing Comm'n, *Federal Offenders Sentenced to Supervised Release*

15   8-9 (July 2010);[9] *see also United States v. Johnson*, 529 U.S. 53, 59 (2000) (noting that "Congress

16   intended supervised release to assist individuals in their transition to community life").

17        The goal of supervised release is to prevent Mr. Melero Luna from engaging in criminal

18   activity and endangering the community, by preventing him from soliciting, possessing or

19   distributing child pornography. This conduct is already explicitly prohibited by Condition 10.

20   Moreover, the probation officer will have the ability to extensively monitor Mr. Melero Luna's

21   internet use, as well as the ability to conduct unannounced searches.  There is no need to impose a

22   blanket ban on internet use – nor does such a ban further Mr. Melero Luna's rehabilitation in that it

23   eliminates his ability to develop a productive and educational use of the internet (using good

24   judgment) while in the controlled environment of supervised release.

25        Mr. Melero Luna should similarly not be required to inform his employer of his restrictive

26   internet condition, which in today's society, is likely to make him unable to work most jobs or lead to

27

28

[9] ussc.gov/sites/default/files/pdf/research-and-publications/2010/20100722_Supervised_Release.pdf.

1  questions about his criminal history that will hamper his ability to work.

2  **4.      The Other Conditions of Supervised Release Are Sufficient to
3           Address Mr. Melero Luna's Ongoing Rehabilitation and to Protect
         the Public**

4         Conditions 5 and 7 should also be struck because the goals of the conditions can be

5  accomplished through the other recommended conditions. Condition #8 allows for extensive searches

6  of Mr. Melero Luna's computer equipment and the installation of monitoring software. Special

7  condition #4 is a blanket search condition of Mr. Melero Luna's person, residence, and devices "at any

8  time with or without suspicion".  Under Special condition #6, he will be required to enroll in the

9  Probation Office's Computer and Internet Monitoring Program, and abide by its requirements, which

10  Mr. Melero Luna has agreed to do outside of his concerns with the Acceptable Use Contract.  He must

11  also consent to the installation of monitoring software and to "unannounced examinations of [his]

12  computer equipment, which may include retrieval and copying of all data" (Special condition # 8).

13  And special condition #9 prohibits Mr. Melero Luna from installing or using data encryption software.

14  These conditions, in addition to the other supervision conditions, adequately address the goals of

15  deterrence, protection of the public, and rehabilitation, without infringing on more liberty than

16  necessary. "There is no need to cut off [Mr. Melero Luna's] access to email or benign internet usage

17  when a more focused restriction, limited to pornography sites and images, can be enforced by

18  unannounced inspection." *Freeman*, 316 F.3d at 392.

19         In addition, Mr. Melero Luna will be subject to several non-computer conditions designed to

20  protect the public, including requirements that he: not possess any child pornography, child erotica, or

21  nude or sexual depictions of any child (Condition 10); register as a sex offender (Condition 14);

22  participate in sex offender treatment (Condition 15); and submit to polygraph testing and psychological

23  testing (Conditions 16 and 17).  With all of these conditions in place, the bans on electronics and the

24  internet do little, if anything, to further public protection.

25  **5.      The Court Should Additionally Decline to Impose Special Conditions
26           5 and 7 because Allowing the Probation Department to Decide
         Whether and Under What Circumstances Mr. Melero Luna Can
27           Possess Electronic Devices or Access the Internet Is an
         Unconstitutional Delegation of the Court's Authority**

28         Challenged conditions 5 and 7 allow for use of the internet or computer with the permission of

1   a probation officer.  However, allowing the defendant to obtain the approval of his probation officer

2   cannot save an overbroad restriction. *See Freeman*, 316 F.3d at 391–92; *LaCoste*, 821 F.3d at 1192;

3   *Wolf Child,* 699 F.3d at 1095–96 & n.4.  It is well-settled that "a probation officer may not decide the

4   nature or extent of the punishment imposed upon a probationer."  *Stephens*, 424 F.3d at 881.  "Under

5   our constitutional system the right ... to impose the punishment provided by law is judicial."  *Ex*

6   *Parte United States*, 242 U.S. 27, 41-42 (1916).  Accordingly, the limitation on the probation

7   officer's authority is "of constitutional dimension."  *Stephens*, 424 F.3d at 881.

8        As a result, "[t]he law has, by and large, developed along the principle that, where the court

9   makes the determination of *whether* a defendant must abide by a condition, and *how*," the court may

10  "delegate to the probation officer the details of where and when the condition will be satisfied."  *Id.*

11  at 880 (footnote omitted) (emphasis in original); *accord Ullman*, 788 F.3d at 1265 (holding that to

12  determine if a condition of supervised release "improperly delegates sentencing authority to a

13  probation officer," the court must "distinguish between permissible delegations that merely task the

14  probation officer with performing ministerial acts or support services ... and impermissible

15  delegations that allow the officer to decide the nature or extent of the defendant's punishment")

16  (citation omitted).

17       In *Stephens*, for example, the Court upheld a condition of supervised release requiring the

18  defendant to participate in a drug treatment program, with the particular program to be selected by the

19  probation officer.  Crucially, "the court itself answered the question of *whether* Stephens would

20  undergo treatment, and whether treatment program testing would be required," while "merely

21  delegating the administrative details of arranging the program to the probation officer."  *Id.* at 882

22  (emphasis in original).  There was no unconstitutional delegation because "[n]o discretion on the

23  subject was given to the probation officer, other than to perform the ministerial tasks of choosing the

24  appropriate program and facilitating Stephens' attendance."  *Id.*

25       By contrast, in *United States v. Esparza*, 552 F.3d 1088 (9th Cir. 2009), the Ninth Circuit

26  concluded that the district court improperly delegated its authority to the probation officer because

27  the supervised release condition required the defendant "to participate in a counseling or sex offender

28  treatment program, 'which *may include* inpatient treatment, as approved and directed by the

1   Probation Officer,'" *Id.* at 1091 (emphasis in original).  Noting that, "[i]n terms of the liberty interest

2   at stake, confinement to a mental health facility is far more restrictive than having to attend therapy

3   sessions, even daily," the Court held that it was impermissible to leave this decision to the discretion

4   of the probation officer.  *Id.*

5          Courts have likewise invalidated conditions that delegate to a probation officer the authority to

6   decide whether, and under what circumstances, a defendant can use the internet.  *See, e.g., Blair*, 933

7   F.3d at 1275-76 (holding that "a special condition of release that gives the probation office discretion

8   to ban completely a defendant's use of the Internet" violates § 3583(d)(2)); *United States v. Scott*,

9   316 F.3d 733, 736 (7th Cir. 2003) (holding that condition prohibiting "access to any Internet Services

10  without prior approval of the probation officer" was an impermissibly "open-ended delegation" of

11  "standardless power").

12         As in these cases, the discretion ceded to the probation officer under Conditions 5 and 7

13  extends far beyond the "ministerial tasks" deemed acceptable in *Stephens*.  The decisions whether

14  and how Mr. Melero Luna may possess a computer or have access to the internet are left entirely up

15  to his probation officer.  Ceding such authority to the probation office is unconstitutional. This is yet

16  another reason this Court should decline to impose special conditions #5 and #7.

17

18  **C.     The Court should Decline to Impose Special Condition #12 because it would bar Mr.**
            **Melero Luna from Visiting any Location where "Children" are "Likely to Gather"**
19          **without Prior Approval.**

20         Proposed condition 12[10] is overbroad and infringes upon Mr. Melero Luna's First Amendment

21  rights more than is reasonably necessary to achieve the goals of supervision. 18 U.S.C. § 3583(d)(2);

22  *see Wolf Child*, 699 F.3d at 1100–01. The First Amendment protects an individual's right to freely

23  associate with others. *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545

24  _____

25  [10] Special condition # 12 reads as follows: "You must not frequent or loiter within 100 feet of any
     location where children are likely to gather, or have contact with any child under the age of 18 unless
26   otherwise approved by the probation officer. Children are likely to gather in locations including, but
     not limited to, playgrounds, theme parks, public swimming pools, schools, arcades, children's
27   museums or other specific locations as designated by the probation officer. This provision does not
     encompass persons under the age of 18, such as waiters, cashiers, ticket vendors, etc., with whom you
28   must deal in order to obtain ordinary and usual commercial services."

(1987); *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 543-44 (1963). Individuals on supervised release maintain this right, as balanced against the goals of supervision. *See, e.g.*, *United States v. Soltero*, 510 F.3d 858, 867 (9th Cir. 2007) (restriction on defendant's association with any known member of a "disruptive group" violated his First Amendment right to freely associate).

Within the sex offense context, courts must look to the facts underlying the particular conviction and determine whether in-person contact with minors contributed to the offense or whether future contact would increase the risk of recidivism. *Compare United States v. Del Valle-Cruz*, 785 F.3d 48, 59–64 (1st Cir. 2015) (invalidating conditions related to personal contact and residing with minors for defendant convicted of failure to register as a sex offender because no evidence he posed future risk of abusing the minors) *with United States v. Mercado*, 777 F.3d 532, 538–39 (1st Cir. 2015) (upholding similar conditions for defendant convicted of same offense because the conditions "draw heavily on the defendant's history and characteristics and are buttressed by case-specific reasons," including the defendant's prior conviction for sexually assaulting a minor). After all, "[c]urrent empirical literature casts serious doubt on the existence of a substantial relationship between the consumption of child pornography and the likelihood of a contact sexual offense against a child." *United States v. Apodaca*, 641 F.3d 1077, 1086 (9th Cir. 2011) (Fletcher, J., concurring).  Where, as here, there is no evidence that a defendant engaged in improper *physical contact* with a minor, the Ninth Circuit has upheld this condition (or a variation of it) only with case-specific evidence indicating a future risk of improper contact. *See, e.g.*, *United States v. Rearden*, 349 F.3d 608, 620 (9th Cir. 2003) (noting defendant used news stories about child murders or abductions to become sexually excited and his own writings described in graphic detail the rape, abuse, and murder of children).

Though the proposed condition may be justified in some cases, it is not in Mr. Melero Luna's. This case is about social media connections over the internet with young women who are teenagers – not children under 14 who are likely to be present and potentially vulnerable at swimming pools, parks and playgrounds in San Francisco.  Because the restriction is worded to ban his presence within 100 feet of any location "where children are *likely* to gather," he would appear to be barred from common spaces that adults largely gather as well -- like Dolores Park, where a playground is in

the middle of the park; Pier 39, or Santa Cruz Beach Boardwalk, which draws both adults and minors in relatively equal numbers.  In Mr. Melero Luna's specific case, Mission Cliffs climbing gym is located a half-block from his residence; per its website, both adult and children's programming are offered there.  *See* https://touchstoneclimbing.com/mission-cliffs/.  Will he be permitted to return to his parents' house post-incarceration given its proximity to this facility if this Court imposes this condition?

In this particular case, Mr. Melero Luna has no prior criminal history—not even an arrest. PSR ¶¶ 35–41. Moreover, there is no evidence that Mr. Melero Luna has inappropriately touched a minor or engaged in any type of physical contact offense whatsoever. PSR ¶¶ 6–15.  While the stated purposes of proposed condition 12 are public protection and rehabilitation, here the record does not indicate a propensity to commit a future sex offense arising from physical proximity with children. *See United States v. Weber*, 451 F.3d 552, 569 (9th Cir. 2006) ("a generalized assessment based on the class of sex offenders generally, rather than on the particular sex offenses a defendant has committed or related offenses he is likely to commit if not treated, cannot fulfill the mandate that a term of supervised release satisfy the 'reasonably related' standard."). Here, there simply is no nexus between Mr. Melero Luna's conduct and the broad ban on in-person interactions with minors that could justify the condition.

Given the fact that Mr. Melero Luna lives in San Francisco, a condition that prevents him from going within 100 feet of any of the hundred-plus parks in the city, or to those parks himself, is unduly burdensome and overbroad.  Such a broad condition is not reasonably related to the goals of deterrence and protection of the public in light of Mr. Melero Luna's specific circumstances and offense. The Court should not impose proposed Condition 12.  In addition, the condition would potentially prevent Mr. Melero Luna from exercising core associational freedoms, such as being in the company of his family members' children or attending family parties, picnics and reunions.

In the alternative, this Court could impose a modified condition that more narrowly tailors the burden on Mr. Melero Luna's liberty to any risk of future interactions with minors, such as:

\\

\\

1
2
3
4
5

You shall not associate or have verbal, written, telephonic, or electronic communication with any person under the age of 18, except in the presence of, or with the permission of, the parent or legal guardian of said minor, unless otherwise approved by the probation officer. This provision does not encompass incidental contacts with persons under the age of 18 or contacts with persons under the age of 18, such as waiters, cashiers, ticket vendors, etc., with whom you must deal in order to obtain ordinary and usual commercial services.

6
7

### CONCLUSION

8
9
10
11
12

For all the reasons set forth above, Mr. Melero Luna respectfully requests that the Court impose the sentence of sixty (60) months in custody, five years of supervised release, $3000 in restitution and a $100 special assessment. Mr. Melero Luna also requests that the Court recommend to BOP that he be housed in California and at a facility that will enable him to maintain contact and connection with his family members.

13
14
15

Dated:     March 10, 2024                    Respectfully submitted,

16
17

JODI LINKER
Federal Public Defender
Northern District of California

18
19

/S
ELIZABETH FALK
Assistant Federal Public Defender

20
21
22
23
24
25
26
27
28

SENTENCING MEMORANDUM
*MELERO LUNA*, CR 22–434 TNT